# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *Plaintiff,* v. **OSAKWE ISMAEL OSAGBUE,** *Defendant.* | Criminal No. 24-00129 (MAJ) |

## OPINION AND ORDER

### I. Introduction

Pending before the Court is Osakwe Ismael Osagbue's ("Defendant") Motion to Suppress filed on August 26, 2024. (**ECF No. 24**). Defendant alleges that, in the course of executing a valid arrest warrant, the Government unlawfully searched his apartment and seized his phone and a computer in violation of the Fourth Amendment of the U.S. Constitution. *Id.* Defendant seeks to suppress not only the items seized, but also "all items found, seized and searched by the government, product of the illegal entry of his apartment on April 9, 2024." (**ECF No. 39 at 1 ¶ 2**). In response, the Government argues that Defendant lacks standing to bring this challenge and that, in any event, Defendant consented to allow the arresting agents to search the apartment. (**ECF No. 58**).

A suppression hearing was held on December 5, 2024. The defense called Defendant to the witness stand, and the Government called arresting agent Lisa Bromley ("Detective Bromley") to testify. The following items were introduced into evidence: a lease document governing the apartment unit searched by the Government, (**ECF No. 74-1**), a photograph of the apartment building where that unit was located, (**ECF No.**

**74–2**), photographs of the investigative tape placed by Government agents on the door of the apartment unit, (**ECF 74–3**) and (**ECF 74–4**), two body-worn camera recordings of Defendant's arrest, (**ECF No. 74–5**), a copy of a Miranda Statement signed by Defendant, (**ECF No. 74-6**), and a copy of a bank withdrawal statement made by Defendant, (**ECF No. 75–1**).

After careful consideration of the evidence introduced at the hearing, the Court finds that the search conducted by arresting agents was lawful. The Motion is therefore **DENIED**.

II. **Facts**

The following facts are drawn from the evidence presented at the suppression hearing: On May 27, 2022, the defendant's father leased apartment 1027 at 11215 Georgia Avenue in Wheaton, Maryland ("the Apartment"). (**ECF No. 74–1 at 22–23**). Defendant's father was the only person listed as an "authorized user" of the unit on the governing lease document, and the terms of the lease prevented the lessee from allowing any person not named on the lease to stay at the apartment overnight. (**ECF No. 74–1 at 44–45**).[1] Nonetheless, defendant had been intermittently living at the Apartment for approximately two years. *(***ECF No. 76 at 13:23–14:3**). Defendant possessed keys to

---

[1] The Government also argued at the hearing that, at the time of his arrest, Defendant was under conditions of supervised release imposed in an unrelated criminal matter out of the District of Maryland that required Defendant to reside with his father at a different address. Accordingly, the Government argues, Defendant could not have had a "reasonable expectation of privacy" at the unit in question because he knew that he was not supposed to reside there. However, the Government provided no evidence at the hearing that Defendant was in fact on supervised release at the time of his arrest, and the Court notes that it appears that Defendant's term of supervised release was terminated on March 12, 2024, approximately one month before his arrest. *See* 19-CR-448-PX-1 at ECF No. 66; *Kowalski v. Gagne*, 914 F.2d 299, 305-06 (1st Cir. 1990) (noting that "[i]t is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand."). Moreover, even if it was true that Defendant was still on supervised release, the Government has provided no case law to support the questionable proposition that the conditions of a person's supervised release may nullify his or her standing to challenge a Fourth Amendment search in an unrelated criminal matter where the search occurred at the dwelling where the accused actually lived.

that apartment and controlled access to the unit, *id.* at 14:4–9. He kept all his personal belongings in the apartment, *id.* at 14:15–18; spent almost every night in that apartment, *id.* at 14:19–21; paid the rent and security deposits for the apartment, *id.* at 15:21; was known to the staff that operated the apartment building, *id.* at 16:12–17; and paid the utilities associated with the unit, *id.* at 19:16–20.

An arrest warrant for defendant was issued on April 3, 2024. (**ECF No. 5**). On April 9, 2024, three agents, including Detective Bromley, entered the building at 11215 Georgia Avenue to execute defendant's arrest. (**ECF No. 76 at 13:23–24, 47:21–48:3**). Detective Bromley recounted that they encountered Defendant in the hallway taking out a bag of trash. *Id.* at 48:24–49:9. The agents stopped Defendant and informed him that they possessed a warrant for his arrest. *Id.* at 49:11–14. The subsequent interaction was captured by the body-worn cameras of Detective Bromley and her partner Detective Adami. (**ECF No. 74–5**). Within less than one minute of encountering Defendant, the arresting agents placed him under arrest. (**ECF No. 74–5**) Video 1 ("Bromley Body Camera") at 01:23–02:00.

After placing Defendant under arrest, Detective Bromley asked him if anybody was at home in his apartment. *Id.* at 02:10. Defendant stated that he lived alone. *Id.* at 02:10–02:15. Detective Adami then asked Defendant, "Hey can we run back to your apartment and make sure, you know, the stove's off. . ." *Id.* at 02:15–02:20. Defendant said "yeah" and nodded his head. *Id.* at 02:18–02:22. The arresting agents then escorted Defendant to the door of his apartment unit. *Id.* at 02:25–02:45. Standing outside of the apartment, one of the agents asked Defendant, "Do you have a key fob, how do you get in?" *Id.* at 02:43–02:45. In response, Defendant stated that the door was open. *Id.* at 02:46. Officer

Bromley placed her hand on the doorknob and Defendant reiterated, "it's open." *Id.* at 02:46–02:48. Officer Bromley then pushed the door to the apartment unit open. *Id.*

Before entering the apartment unit, Defendant asked if he could get his phone and stated that he wanted to bring the phone with him. *Id.* at 03:43–03:48. The arresting agents then entered the apartment unit with Defendant. *Id.* at 04:00.

Upon entering the apartment, Detective Bromley conducted a cursory sweep of the unit. *Id.* at 04:00–05:00. During the search, Detective Bromley opened closet doors, briefly glanced inside multiple closets, and entered multiple rooms adjoining the main area where Defendant stood with arresting officers. *Id.* At no point did Detective Bromley rummage through any of Defendant's personal belongings. *Id.*

Immediately upon entering the apartment, Detective Adami located Defendant's cell phone on the kitchen countertop and asked Defendant if that was the cell phone he wanted to take with him. (**ECF No. 75–5**) Video 2 ("Adami Body Camera") at 04:00. Defendant expressly stated that he wanted to take the phone with him. *Id.* at 04:10. Defendant also stated that he wanted to bring his keys with him. *Id.* at 04:45–05:05. While inside the apartment, Detective Bromley observed in plain view a sum of US currency and a second cell phone. *See* Bromley Body Camera at 05:30–05:40. Those items were not seized at the time of Defendant's arrest. The only items seized from the apartment were Defendant's phone and a set of keys to the apartment unit. At no point during Defendant's arrest can agents be seen yelling, harassing, or intimidating the defendant.

Once the agents took the defendant to the police station, Detective Bromley returned to the building and placed a yellow investigative tape on the apartment's door. (**ECF No. 76 at 52:11–16**). Detective Bromley also left her business card, alongside a

note requesting that any person attempting to enter the apartment contact her office first. *Id*. at 53:19–21. The evidence taped placed on the door of the apartment did not prevent anyone from entering the apartment. *Id*. at 53:4–8.

Subsequent to the arrest, the Government filed an application for a search warrant that relied on the arresting agents' observations inside the apartment unit. *See* 8:24-MJ-00920-TJS. In addition, the Government later filed a warrant application seeking judicial authorization to search Defendant's phone. *Id*.

### III. Analysis

#### A. Standing

"The capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy." *United States v. Stokes*, 829 F.3d 47, 51 (1st Cir. 2016) (quotations and citations omitted). This is known as "standing doctrine." *Id*. Under this doctrine, to challenge a purportedly illegal search and seizure, "the defendant carries the burden of making a threshold showing that he has a reasonable expectation of privacy in the area searched and in relation to the items seized." *Id*. (quotations and citations omitted).

To establish a "legitimate expectation of privacy," a Defendant must show (1) "an actual, subjective, expectation of privacy;" and (2) that "such subjective expectation is one that society is prepared to recognize as objectively reasonable." *United States v. Rheault*, 561 F.3d 55, 59 (1st Cir. 2009). Since there is no dispute that Defendant had a subjective expectation of privacy in the apartment searched, (**ECF No. 76 at 20:10–12**), the only question is whether Defendant had an objectively reasonable expectation of privacy at that location. *United States v. Cardona-Sandoval*, 6 F.3d 15, 20–21 (1st Cir. 1993) ("To demonstrate a subjective expectation of privacy, the Court has required little more than

evidence that defendants made some minimal effort to protect their property or activities from warrantless intrusions.") (quotations and citations omitted).

In response to Defendant's Motion to Suppress, the Government invokes the rule that a "defendant lacks a legitimate expectation of privacy in a place… when he does not have permission to be present." *United States v. Battle*, 637 F.3d 44, 49 (1st Cir. 2011); *Amezquita v. Hernandez-Colon*, 518 F.2d 8, 11 (1st Cir. 1975) (holding that squatters lacked standing to challenge search of property which they did not own). Specifically, the Government raises an argument that Defendant did not have a legitimate expectation of privacy in the apartment since the lease was assigned to his father and included an express term forbidding the lessee from allowing any overnight guests not duly registered to stay in the apartment.

It is well-established that "home ownership is not necessary to establish standing." *United States v. Fernandez Santos*, No. CR 23-063 (FAB), 2023 WL 8915838, at *5 (D.P.R. Dec. 27, 2023), *report and recommendation adopted in part, rejected in part sub nom. United States v. Fernandez*, 716 F. Supp. 3d 8 (D.P.R. 2024) (adopting the Magistrate's findings on standing). Indeed, even "overnight guests" have standing to challenge unlawful searches of the premises where they are staying as a guest. *Minnesota v. Olson*, 495 U.S. 91, 96–97 (1990). To invoke the Fourth Amendment, the overnight guest must have permission to be present in the area searched. *Id.* ("The houseguest is there with the permission of his host, who is willing to share his house and his privacy with his guest… [guests] are entitled to a legitimate expectation of privacy despite the fact that they have no legal interest in the premises and do not have the legal authority to determine who may or may not enter the household."); *Cf. United States v. Gale*, 136 F.3d 192, 195 (D.C. Cir. 1998) (holding that there is no legitimate expectation of privacy in

apartment where the accused occupied the residence without permission of *either* its tenant or any other legal authority). Defendant lived as an overnight guest at the apartment unit in question with the express permission of his father, the authorized lessee of the unit. Defendant therefore had a legitimate expectation of privacy in the apartment.

The fact that Defendant was likely in technical violation of the lease does not undermine his legitimate expectation of privacy in the apartment. Under similar facts, the Supreme Court has recently held that mere technical violation of a lease agreement does not deprive a lawful possessor of property of legitimate expectations of privacy under the Fourth Amendment. *Byrd v. United States*, 584 U.S. 395, 408 (2018) (holding that the defendant had a reasonable expectation of privacy in a rental car, despite the fact that he was not an authorized driver and the rental agreement expressly provided that only authorized drivers were permitted to operate the vehicle); *see also Lyle v. United States*, 584 U.S. 991 (2018) (vacating and remanding, "in light of Byrd v. United States," where lower court held a Defendant lacked standing when he was an unauthorized and unlicensed driver of the rental car that was searched). As Justice Gorsuch explained in Carpenter, "People call a house 'their' home" even when they lack legal title; such "tenants and resident family members—though they have no legal title—have standing to complain about searches of the houses in which they live." *Carpenter v. United States*, 585 U.S. 296, 401 (2018) (Gorsuch, J., dissenting).

Furthermore, other circuits have previously held that a tenant who is merely in technical violation of an apartment lease may still have a reasonable expectation of privacy in their apartment. *United States v. Curlin*, 638 F.3d 562, 565-66 (7th Cir. 2011) (collecting cases). Indeed, in other cases where the Government has challenged the legitimate privacy expectations of a tenant who is in technical violation of their lease, the

relevant distinction is whether the tenant has been subject to a formal eviction proceeding. *See Ryan v. Mary Immaculate Queen Center,* 188 F.3d 857, 859 (7th Cir. 1999) (holding that tenants had standing under the Fourth Amendment where police officers attempting to serve tenants with a summons in landlord's eviction action conducted a warrantless search, since the landlord had not yet obtained a valid order granting him exclusive possession of the premises); *see also United States v. Washington,* 573 F.3d 279, 284 (6th Cir. 2009) (holding that, despite being in technical violation of a lease, a tenant retains an objectively reasonable expectation of privacy until their landlord takes legal action to evict).[2] Prior cases thus recognize a crucial distinction between a mere trespasser, on the one hand, and a person who has not been formally instructed to vacate their residence and has not been lawfully evicted from that location. *Cf. Amezquita v. Hernandez-Colon*, 518 F.2d 8, 11 (1st Cir. 1975) (holding that squatters lacked standing to challenge search of property which they did not own).

Following the logic of these cases, the fact that Defendant was apparently in technical violation of an apartment lease does not deprive him of standing to challenge the search in question. The evidence on the record indicates that Defendant was staying at the apartment with the express permission of his father. Furthermore, he was known to the management of the apartment building, and he regularly made rent and utility

---

[2] The Court notes that in similar cases not involving landlord-tenant relations, before an overnight guest loses their legitimate expectations of privacy, a property owner must at least give some form of express notice to their guests directing them to vacate the premises. *Compare United States v. Rambo*, 789 F.2d 1289, 1295–96 (8th Cir. 1986) (holding that, where hotel occupant was asked to leave by police officers acting on behalf of hotel management, that person no longer had a reasonable expectation of privacy in the hotel room) *with United States v. Young,* 573 F.3d 711, 720 (9th Cir.2009) (holding that a hotel guest had an objectively reasonable expectation of privacy in their hotel room, as the guest had not yet been evicted from the room at the time of the warrantless search). Because it is undisputed that Defendant was neither expressly told to vacate the apartment nor subject to formal eviction proceedings, the Court need not determine which action would have sufficed to dispel Defendant's legitimate expectations of privacy in the apartment unit.

payments for the unit. There is no countervailing evidence that Defendant was ever ordered to leave the apartment or otherwise informed that he was not supposed to stay there, much less that he had been evicted from the apartment. Although the Government has demonstrated that Defendant was likely in technical violation of the lease agreement for his apartment, it is equally clear that he maintained his residence in the apartment with the express permission of his father, the lessee, and the implied authorization of the lessor. Accordingly, Defendant has standing to challenge the search that took place during the course of his arrest.

**B. Consent**

The Fourth Amendment to the U.S. Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. CONST. amend. IV. "[A] warrant is generally required for a search of a home, but the ultimate touchstone of the Fourth Amendment is reasonableness[.]" *Fernandez v. California*, 571 U.S. 292, 298 (2014) (citations and quotations omitted). Consent searches constitute a traditionally recognized category of permissible warrantless searches. *Id.* ("Consent searches are part of the standard investigatory techniques of law enforcement agencies and are a constitutionally permissible and wholly legitimate aspect of effective police activity.") (citation and quotations omitted).

Consent searches are, however, a "jealously and carefully drawn exception" to the warrant requirement. *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (citation and quotations omitted). "When an occupant gives his or her consent to enter, he or she is waiving a valuable constitutional right." *Id.* at 124 (Stevens, J., dissenting). The Government therefore must prove that consent to a warrantless search is valid and

voluntary. *See Schneckloth v. Bustamonte*, 412 U.S. 218 (1973); *United States v. Casey*, 825 F.3d 1, 13 (1st Cir. 2016) ("A prosecutor who seeks to rely on the lawfulness of a search bears the burden to show the consent was freely and voluntarily given.") (citation and quotations omitted). Even where consent is valid, the resulting search cannot exceed the scope of consent granted. *United States v. Marshall*, 348 F.3d 281, 286–87 (1st Cir. 2003).

There is no doubt that Defendant provided express consent to the challenged search. When one of the arresting agents asked Defendant if they could return to his apartment, Defendant said "yeah" and nodded his head. Bromley Body Camera at 02:15-02:22. Once the arresting agents had escorted Defendant to the door of his apartment unit, they did not enter the apartment until Defendant informed them that the door was open. *Id.* at 02:46–02:48. But our analysis cannot stop here. The Court must address whether (1) Defendant's consent was valid, and (2) whether the resulting search exceeded the scope of the consent granted by Defendant.

### i. Defendant's Consent was Free and Voluntary

Courts evaluate the voluntariness of consent under a "totality-of-the-circumstances" approach, where both "the characteristics of the accused and the details the [police-citizen interaction]" are relevant. *Schneckloth*, 412 U.S. at 226. Relevant factors may include whether defendant had "knowledge of the right to refuse consent[,]" was not in a "vulnerable subjective state[,]" and evidence of "inherently coercive tactics." *United States v. Bey*, 825 F.3d 75, 80 (1st Cir. 2016).

"Among the individualized factors bearing on the vulnerability of the consenting party are age, education, experience, intelligence, and knowledge of the right to withhold consent." *United States v. Casey*, 825 F.3d 1, 13 (1st Cir. 2016). "While knowledge of the

right to refuse consent is one factor to be taken into account," arresting officers are not categorically required to advise a citizen of their right to refuse consent. *Bey*, 825 F.3d at 80.

In this case, the individualized characteristics of Defendant support the conclusion that his consent was freely and voluntarily given at the time of his arrest. Defendant was 36 years old, had no history of mental health issues, had attained some college education, and had been arrested on at least five prior occasions, including once in connection with a federal case charging Defendant with the commission of a felony. (**ECF No. 45-1**). While Defendant was not expressly advised of his right to withhold consent, the Court finds that Defendant was not in a uniquely vulnerable position during his encounter with the arresting agents.

Neither is there evidence that "inherently coercive tactics" were employed during Defendant's arrest. *Bey*, 825 F.3d at 80. In analyzing whether consent was given freely and voluntarily, the ultimate question is whether there is "conduct by … law enforcement agents that would amount to psychological coercion or intimidation." *U.S. v. Rosario Diaz*, 202 F.3d 54 (1st Cir. 2000); *see United States v. Pastrana Roman*, No. CR 19-104 (ADC), 2024 WL 2269054, at *17 (D.P.R. May 17, 2024) (holding that, despite an extensive police presence at the site of the arrest, there were no "coercive circumstances" because the defendant met the arresting agents outside with a gun in his hands, re-entered his home without resistance from the agents, who subsequently announced that they were acting on a warrant and performed the arrest without using any force).

To establish that his consent was coerced, Defendant advances two arguments. First, Defendant argues that the fact he was placed under arrest before he provided consent to the search renders that consent inherently coerced. But "the First Circuit has

Case 3:24-cr-00129-MAJ    Document 77    Filed 01/03/25    Page 12 of 16
Crim. No. 24-129 (MAJ)                                                                                      Page 12

held that being handcuffed is no benchmark for coerciveness." *Pastrana Roman*, 2024 WL 2269054, at *18 (citations omitted). Indeed, the mere fact that a person is handcuffed and placed under arrest does not render their consent to a warrantless search "involuntary." *See United States v. Navedo-Colon*, 996 F.2d 1337, 1338 (1st Cir. 1993) (despite the fact that the accused was handcuffed to a chair and questioned for almost an hour, the circumstances fell within the bounds of what courts have deemed valid and voluntary consent); *United States v. Watson*, 423 U.S. 411, 424 (1976) (custody alone does not demonstrate coerced consent to search); *United States v. Barnett*, 989 F.2d 546, 555 (1st Cir. 1993) (holding that consent was valid where the defendant "was met at the door of his home by seven or eight law enforcement officers, with guns drawn," was "arrested and handcuffed," and was "advised … of his Miranda rights"); *United States v. Jones*, 523 F.3d 31, 38 (1st Cir. 2008) (holding that consent was valid after "some ten to fifteen government agents, guns drawn, entered [the defendant's] hotel suite without knocking, handcuffed him, placed him in a separate room, and proceeded to interrogate him"). Thus, the mere fact that Defendant was under arrest when he consented to the search does not render the circumstances of his consent "coercive."

Defendant also argues that the arresting agents used deceptive means to solicit his consent to enter the apartment. (**ECF No. 24 at** 7) (alleging that the arresting agents "used a ruse to try to make the defendant enter his own apartment after he was arrested without any Miranda warnings and gain access to his apartment after his arrest"). While "[d]eceit can be relevant to voluntariness[,]" *United States v. Spivey*, 861 F.3d 1207, 1213 (11th Cir. 2017), not all forms of deceit render consent involuntary. "An officer's strategic deployment of an empty promise" does not, "standing alone, [constitute] coercion sufficient to vitiate consent in this context." *Caniglia v. Strom*, 953 F.3d 112, 121 (1st Cir.

2020) (overturned on other grounds). Moreover, "the general consensus in the case law is that [...] deception, including lying about the purpose of an investigation, is not categorically off-limits[.] The question instead is whether the deception in context rendered the consent involuntary." *Pagan-Gonzalez,* 919 F.3d at 593–94.

Indeed, the First Circuit has endorsed "the longstanding principle that deception is a well-established and acceptable tool of law enforcement." *Id*. There are two forms of deceit that have been consistently held to render consent ineffective. First, as a categorical rule, "deception invalidates consent [to a warrantless search] when police claim authority they lack[.]" For instance, where the police falsely claim to have a search warrant, that false claim of authority invalidates consent. *Id*. (citations and quotations omitted). Second, "courts have regularly held that coercion is implicit when officers falsely present a need for urgent action[,]" such as when "agents falsely [imply] that a bomb [is] planted in the apartment" they intend to search, provide a false report of a dangerous gas leak as the basis for entering a residence, or falsely claim to be conducting a search for a missing person reported to be present in the location searched. *Id*. at 595.

Neither circumstance is present in the facts before the Court. Although the Defendant alleges that Government agents solicited his consent by a "ruse," he never defined the nature of the purported "ruse" or identified any conduct by the arresting agents that would have rendered his consent involuntary. The arresting agents, who were very respectful, and always addressed the defendant in a normal tone of voice, never claimed that they possessed a search warrant or that they would soon obtain a search warrant to enter the apartment. Nor did they falsely present a need for urgent action by providing a false report of imminent danger. Instead, the arresting agents merely asked the Defendant whether he would like to check to ensure that his stove was turned off.

Bromley Body Camera at 02:15–02:20 and whether he would like to get his phone, *id.* at 03:46, to which the defendant answered in the affirmative. *Id.* at 03:48. Accordingly, the Court finds that the arresting agents did not engage in any "deception" during the course of the arrest.

Contrary to the defendant's assertions, he was never coerced into consenting to the search. After examining the "totality of the circumstances" and the extent of the dialog between the defendant and the arresting agents, the Court concludes that the consent provided by the defendant was free and voluntary.

> ii.    **The Scope of the Search did not Exceed the Scope of Consent**

"Warrantless searches may not exceed the scope of the consent given." *United States v. Marshall*, 348 F.3d 281, 286–87 (1st Cir. 2003). "Courts therefore look beyond the language of the consent itself, to the overall context, which necessarily encompasses contemporaneous police statements and actions." *Id.* (citations and quotations omitted). "The scope of a warrantless, but consensual, search is generally defined by its expressed object." *Id.* (citation omitted).

Defendant consented to allow the officers to enter his apartment to retrieve his cell phone, which is exactly what the officers proceeded to do. Bromley Body Camera at 03:40–04:00; Adami Body Camera at 04:00–05:05. Upon entering the apartment, the officers did not exceed the scope of that consent, except by conducting a cursory sweep of the apartment.[3]

---

[3] During the course of the protective sweep, Detective Bromley noticed a bundle of US currency, an additional cell phone, and a laptop computer sitting in plain view on a chair in the kitchen area of the apartment. Bromley Body Camera at 05:30. Because none of these items were seized at the time of Defendant's arrest, the Court need not analyze the applicability of the so-called "plain-view" doctrine. *See, e.g., United States v. Hamie*, 165 F.3d 80, 82 (1st Cir. 1999).

It is well-established that law enforcement officers who perform an arrest inside a suspect's home may conduct a "protective sweep" of the residence to ensure their safety. *See Maryland v. Buie*, 494 U.S. 325, 334 (1990). This expanded authority functions as a "precautionary matter" and is limited to, *e.g.*, "look[ing] in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334. The relevant body-worn camera footage shows clearly that, upon entering the apartment, Detective Bromley conducted nothing more than a cursory sweep of the unit, during which she briefly glanced inside multiple closets and entered multiple rooms adjoining the main area where Defendant stood with arresting officers. *Bromley Body Camera* at 04:00-05:00. At no point did Detective Bromley rummage through any of Defendant's personal belongings, nor did she seized any other items, as Defendant has alleged. *Id.*; (**ECF No. 24-1 at 2–3 ¶¶ 20, 25**). Thus, the evidence shows that Detective Bromley did not exceed the limits of a purely "cursory inspection" designed to ensure the safety of herself and the other arresting agents. *See id.* Because Defendant consented to allowing the Officers to enter his apartment to retrieve his phone, and the Officers' search was limited to looking for the phone along with a legitimate protective safety sweep, the challenged search of the apartment did not exceed the boundaries of the Fourth Amendment.

### IV. Conclusion

Although Defendant has standing to challenge the warrantless search of his apartment unit that took place during the course of his arrest, the search was lawful. Defendant provided valid consent to the search, and the arresting agents did not exceed the scope of that consent.

For those reasons, the Court finds that Defendant has failed to establish a violation of the Fourth Amendment of the United States Constitution. Defendant's Motion to Suppress is therefore **DENIED.**

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 3rd day of January 2025.

**<u>/s/ María Antongiorgi-Jordán</u>**
**MARIA ANTONGIORGI-JORDAN**
**UNITED STATES DISTRICT JUDGE**
